# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ADP, LLC,

      **Plaintiff,**

      **v.**

JASON OLSON,

      **Defendant.**

Civ. No. 20-03312 (KM) (JBC)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Defendant Jason Olson was a top-producing sales associate at Plaintiff ADP, LLC. During his nineteen-year period of employment at ADP, Olson signed several restrictive covenants in which he agreed, in the event that he left ADP, not to (1) compete with the company, (2) disclose its confidential information, or (3) solicit its clients. In December 2019, Olson left ADP, allegedly because ADP investigators had discovered that he had been submitting fraudulent sales contracts in exchange for unearned commissions. It appears that Mr. Olson now works for Paycor, one of ADP's direct competitors. ADP considers this a violation of several provisions of the restrictive covenants and now moves this Court for entry of an order enjoining Olson from continuing to breach his non-compete obligations and from breaching the other restrictive covenant obligations owed to ADP. (DE 3).

For the reasons that follow, APD's motion is **GRANTED**, subject to certain limitations on the scope of the restrictive covenant as written. My decision, which does not depend on any disputed facts, is entered based on the briefs and affidavits, without an evidentiary hearing.

1

## I.   BACKGROUND[1]

### A. Olson's Employment

Olson worked at ADP for approximately nineteen years, in several positions. (Compl. ¶ 9.) He started as a district manager in ADP's Small Business Services Division in 2000, where he remained until March of 2015, when he was promoted to the position of Up Market District Manager in ADP's Major Accounts Services Division. (*Id.* ¶¶ 9–10.)

After Olson joined ADP, the company provided him with specialized training which included general information about ADP products and services, as well as specialized information about his particular clients. (*Id.* ¶ 23.) The training information included the strengths and weaknesses of ADP's products and services; the strengths and weaknesses of other ADP sales associates; the way ADP sells its products and services; the way ADP differentiates its products and services from its competitors; the relative advantages and disadvantages between ADP's products and services and those of its competitors; the methods by which ADP effectively competes with its competitors; ADP's pricing models and costs; ADP's planned improvements and expected new products; and complaints made by ADP customers. (*Id.*) This information is generally confidential to ADP, and ADP prohibits its disclosure or use by former employees. (*Id.*). During his time at ADP, Olson gained substantial access to such confidential information. (*Id.* ¶ 17). He also had significant and direct contact with ADP's existing and prospective clients. (*Id.*).

During his time at ADP, Olson also had access to, and regularly used, ADP's confidential, proprietary, and trade secret information. (*Id.*). This information included ADP's confidential business methods; procedures,

---

[1]   Certain key items from the record will be abbreviated as follows:

| | | |
|---|---|---|
| DE __ | = | Docket entry number in this case |
| Compl. | = | Complaint (DE 1) |
| Pl.'s Br. | = | Plaintiff's Brief in Support of Preliminary Injunction (DE 3-1) |
| Opp. | = | Olson's Opposition (DE 16) |

pricing, and marketing strategies; client information, including names, preferences, and needs; and information regarding the terms of client contracts. (*Id.*). ADP attempts to maintain the secrecy of this proprietary information by requiring employees to sign NDAs; limiting access to proprietary information on a need-to-know basis; requiring security and password protection on its work systems; and reminding and training its employees about the sensitive nature of this information. (*Id.* ¶ 26.)

ADP alleges that Olson, in his position as Up Market District Manager, sold products to ADP clients along Florida's southeast coast, including Broward, Miami-Dade, Monroe, and Palm Beach Counties. (*Id.* ¶ 11.) ADP claims that Olson's sales in that position came primarily from referrals he received from health insurance brokers located in that region. (*Id.* ¶ 13.) ADP also alleges that from July 2018 to June 2019, Olson additionally served as a "hunter" in Broward County, where he was assigned a list of ADP prospects. (*Id.* ¶ 15.) Finally, ADP alleges that Olson was assigned a list of 150 additional ADP customers in Broward and Palm Beach Counties, to which he was expected to sell additional ADP products and services. (*Id.* ¶ 14.)

For his part, Olson admits that in July 2017, ADP assigned him to work as a "Broker District Manager – Healthcare" developing leads in Palm Beach, Broward, Miami-Dade, and Monroe Counties. (Opp. at 3.) He argues, however, that though he was assigned to those four counties, he "almost exclusively" worked in the southern half of Broward County. (*Id.*) Olson claims that he was reassigned in July 2019 to serve as a "Client Services Representative" in only Palm Beach County. This assertion is qualified by an admission later in his opposition that he serviced Palm Beach, Broward, Miami-Dade, and Monroe Counties as both a "hunter" in 2018 and as a client services representative in 2019. (*Id.* at 3–4.)

### B. The Nondisclosure Agreement, Sales Representative Agreement, and Restrictive Covenant Agreement

As a part of his employment with ADP, Olson entered into a nondisclosure agreement ("NDA") and a sales representative's agreement ("SRA"). (Compl. ¶¶ 17–18.)

The SRA includes non-solicitation, non-disclosure, non-use, and return of property provisions. The non-solicitation agreement applies for a year after the employee leaves ADP. (*Id.* ¶ 18(a)). It prohibits contacting ADP clients or prospective clients to which the employee was exposed during his or her employment, if those clients are located within 75 miles of any territory the employee was assigned or any office where the employee worked. (*Id.*)

The SRA's non-disclosure agreement prohibits the disclosure of ADP information, including business methods, pricing and marketing structures, programs, forms, confidential information, trade secrets, client names or addresses, or "any other information relating to the ADP group learned by the Employee at any time during Employee's employment with the Company." (*Id.* 18(b).) It additionally requires that the employee return all ADP materials he may possess after his employment terminates. (*Id.*)

In addition to the SRA and NDA, which all ADP employees must sign, Olson signed a restrictive covenant agreement ("RCA"). That agreement grants Olson access to a stock award program, which is only available to high-performing employees. (*Id.* ¶ 19.) In exchange for access to the stock program, however, the RCA imposes greater non-solicitation and non-compete obligations on the employee. ADP reasons that these greater restrictions are necessary because high-performing sales associates have exceptionally strong relationships with ADP clients and possess more information about such clients than the typical employee, and thus pose a particular risk to ADP's client relationships and goodwill. (DE 1-1 Exh. C ¶ 12.) Olson most recently entered an RCA on October 3, 2019. (Compl. ¶ 22.)

**1. RCA Non-Solicitation**

The 2019 RCA contains a non-solicitation provision that is more restrictive than the one found in the SRA. The RCA's provision prohibits employees, for one year after their departure from ADP, from soliciting or diverting any business from an ADP client whom (1) ADP provided services for in the two years, if Olson worked on the client; (2) ADP provided services for in the past year, if the client is located within Florida; (3) Olson solicited or contacted on ADP's behalf in the two years before he left the company; or (4) about whom Olson has any confidential information. (DE 1-1 Exh. C. ¶ 5.a) Under the provision, ADP "clients" are defined to include any individuals or companies (1) to whom ADP provides products; (2) to whom ADP provided products within the one year period prior to Olson's termination of employment from ADP; (3) whom Olson solicited within the two years prior to Olson's termination of employment; or (4) as to whom Olson has any confidential information or trade secrets. (DE 1-1 Exh. C. ¶ 1.c)

**2. RCA Non-Compete**

The RCA also contains a non-compete provision. It provides that, for one year after Olson leaves ADP, he may not work for a competing business anywhere within his prior territory if doing so would require him to provide the same or substantially similar services or use ADP confidential information. (DE 1-1 Exh. C ¶ 4) Olson's "territory" is defined as the geographic area where he worked or represented ADP in the two years preceding leaving ADP, and "competing businesses" include any companies engaged in substantially the same busines as the sector of ADP that Olson worked in. (*Id.*)

**3. Specific Provisions in the 2019 RCA**

The 2019 RCA contains the following relevant provisions:

> **1. Definitions.**
>
> . . . .
>
> **d. "Competing Business"** means any individual (including me), corporation, limited liability company,

partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, that part of the Business of ADP in which I have worked or to which I have been exposed during my employment with ADP (regardless of whether I worked only for a particular segment of that part of the business in which I worked—for example, business segments based on the number of employees a Client has or a particular class of business using an ADP product or service).

. . . .

**j. "Territory"** means the geographic area where I worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of my employment with ADP.

. . . .

**4. Non-Competition.** I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not directly or indirectly, own, manage, operate, join, control, finance, be employed by or with, or participate in any manner with a Competing Business where doing so will require me to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use, disclose or disseminate ADP's Confidential Information or trade secrets. However, after my voluntary or involuntary termination of my employment for any reason and with or without cause, nothing shall prevent me from owning, as an inactive investor, securities of any competitor of ADP which is listed on a national securities exchange.

**5. Non-Solicitation of and Non-Interference with Clients, Business Partners, and Vendors.**

**a. Clients:** I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any

6

reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly, solicit, divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from any Client for the purposes of providing products or services that are the same as or substantially similar to those provided in the Business of ADP. I also agree that I will not induce or encourage or attempt to induce or encourage any Clients to cease doing business with ADP or materially alter their business relationship with ADP.

**b. Business Partners:** I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly engage, contract with, solicit, divert, appropriate or accept any business from, or attempt to engage, contract with, solicit, divert, appropriate or accept any business from any Business Partner for the purpose of providing to me or any Competing Business any product or service within the United States of America that is (a) the same as or substantially similar to the product or service provided to ADP and which ADP uses for, uses for obtaining, or distributes to, its Clients or (b) specialized, customized or designed by the Business Partner for ADP. This provision applies only to a Business Partner: (i) with whom ADP currently has a commercial or business relationship in connection with the Business of ADP; (ii) with whom ADP has had a commercial or business relationship in connection with the Business of ADP within the one (1) year period prior to my voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; or (iii) about whom I have any Confidential Information or trade secret information. I also agree that I will not induce or encourage or attempt to induce or encourage any Business Partner to cease doing business with ADP or materially alter their business relationship with ADP.

**c. Vendors:** I agree that during my employment and for a period of twelve (12) months following the

voluntary or involuntary termination of my employment for any reason and with or without cause, I will not induce or encourage or attempt to induce or encourage any Vendor to cease doing business with ADP within the United States of America or materially alter their business relationship with ADP within the United States of America.

**6. Non-Solicitation of Employees.** I agree that during my employment with ADP and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, hire, solicit, recruit, or encourage to leave ADP, any current employees of ADP or hire, solicit, recruit, or contract with employees who terminate their employment with ADP within twelve (12) months following my termination date.

**7. Non-Disclosure and Non-Use of Confidential Information and Trade Secrets.** During my employment, except as authorized and required to perform my duties for ADP, and after the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not access, disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or trade secrets or take any action causing, or fail to take any action necessary in order to prevent, any such information to lose its character or cease to qualify as Confidential Information or a trade secret. I agree to inquire with ADP if I have any questions about whether I am authorized or required to access, disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or whether particular information is Confidential Information or a trade secret before accessing, using or disclosing such information. I also agree to immediately return to ADP all property and information belonging to ADP such as keys, credit cards, telephones, tools, equipment, computers, passwords, access codes, pin numbers, and electronic storage devices, as well as all originals, copies, or other physical embodiments of ADP's Confidential Information or trade secrets (regardless of whether it is in paper, electronic, or other form), including any such information in any programs,

business forms, manuals, correspondence, files, databases, or on computer disks or any other storage medium, including but not limited to cloud storage, whether or not owned or controlled by me or ADP (e.g., social and business networking websites, web-based email servers, Notability, or cloud storage services), immediately upon termination of my employment or upon any earlier request by ADP, and I agree not to keep, access, disclose, use, reproduce, distribute, or otherwise disseminate any copies, electronic or otherwise, of any of the foregoing. I also understand that my obligations under this paragraph, as well as the other covenants in this Agreement, extend to my activities on the internet, including my use of business oriented social networking sites such as LinkedIn and Facebook. This shall include deleting any business related connections or contacts, including all ADP Clients and Business Partners, that I inputted in or with whom I connected on any business oriented social networking sites, my LinkedIn account, any cloud storage, any electronic device, or any cell phones while employed at ADP.

I understand that nothing in this Agreement is intended to prohibit any non-supervisory employee's right to discuss wages, terms and conditions of employment, or other conduct protected by Section 7 of the National Labor Relations Act.

Pursuant to 18 U.S.C. § 1833(b), and as set forth fully therein, notice is hereby given that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not

disclose the trade secret, except pursuant to court order.

I understand that nothing in this Agreement prohibits me from reporting possible violations of state or federal law or regulation to any governmental agency or entity or from communicating with any such agency or entity regarding the same or otherwise participate in any investigation or proceeding that may be conducted by any government agency, including providing documents or other information, without notice to ADP. This Agreement does not limit my right to receive an award for information provided to any government agencies. I understand that nothing in this Agreement shall have the purpose or effect of concealing details related to a claim of discrimination, retaliation, or harassment.

**8. Prior Agreements and Disclosure of Agreement to Third Parties.** I agree to provide a copy of this Agreement to any subsequent employer, person, or entity to which I intend to provide services that may conflict with any of my obligations in this Agreement prior to engaging in any such activities and to provide ADP in writing the name and address of any such employer, person, or entity and a description of the services I intend to provide, including the territory in which I plan to work, prior to engaging in any such activities. I agree that ADP may also provide a copy of this Agreement or a description of its terms to any Client, subsequent employer, or other third party at any time as it deems necessary to protect its interests, and I agree to indemnify ADP against any claims and hold ADP harmless from any losses, costs, attorneys' fees, expenses, fees, and damages arising out of my failure to comply with this paragraph or ADP's providing a copy of this Agreement or a description of its terms to any Client, subsequent employer, or other third party.

. . . .

**10. Choice of Law, Venue, and Jurisdiction.** The interpretation, validity, and enforcement of this Agreement will be governed by the laws of the State of New Jersey, without regard to any conflicts of law

principles that require the application of the law of
another jurisdiction. I agree that any action by me to
challenge the enforceability of this Agreement must be
brought or litigated exclusively in the appropriate state
or federal court located in the State of New Jersey. I
also agree that any action by ADP to enforce this
Agreement, as well as any related disputes or litigation
related to this Agreement, may, but do not have to, be
brought in the appropriate state or federal court
located in the State of New Jersey. I agree and consent
to the personal jurisdiction and venue of the federal or
state courts of New Jersey for resolution of any
disputes or litigation arising under or in connection
with this Agreement or any challenge to this
Agreement and waive any objections or defenses to
personal jurisdiction or venue in any such proceeding
before any such court.

. . . .

**12. Relief, Remedies, and Enforcement.** I
acknowledge that ADP is engaged in a highly
competitive business, and the covenants and
restrictions contained in this Agreement, including the
geographic and temporal restrictions, are reasonably
designed to protect ADP's legitimate business
interests, including ADP goodwill and client relations,
Confidential Information and trade secrets, and the
specialized skills and knowledge gained by me and
ADP's other employees during our employment. I
acknowledge and agree that a breach of any provision
of this Agreement by me will cause serious and
irreparable damage to ADP that will be difficult to
quantify and for which a remedy at law for monetary
damages alone may not be adequate. Accordingly, I
agree that if ADP should bring an action to enforce its
rights under this Agreement and ADP establishes that
I have breached or threatened to breach any of my
obligations under this Agreement, ADP shall be
entitled, in addition to all remedies otherwise available
in law or in equity, to a temporary restraining order, a
preliminary injunction, and a permanent injunction
enjoining such breach or threatened breach in any
court of competent jurisdiction without the necessity
of posting a surety bond, as well as an equitable
accounting of all profits or benefits arising out of any

violation of this Agreement. I also agree that nothing in this Agreement shall be construed to prohibit ADP from pursuing any and all other legal or equitable remedies available to it for breach of any of the provisions of this Agreement, including the disgorgement of any profits, bonuses, commissions, or fees realized by me, any subsequent employers, any business owned or operated by me or to which I provide services, or any of my agents, heirs, or assigns. I also agree that that the knowledge, skills, and abilities I possess at the time of commencement of my employment are sufficient to permit me to earn a livelihood satisfactory to me without violating any provision of paragraphs four (4) through seven (7) above, for example, by using such knowledge, skills, and abilities, or some of them, in the service of business that is not competitive with ADP. I further agree to pay any and all legal fees, including without limitation, all attorneys' fees, court costs, and any other related fees and/or costs incurred by ADP in enforcing this Agreement.

(DE 1-1 Exh. C, ¶¶ 1(d), (j), 4–8, 10, 12–13, 16 & 20.)

### C. Olson Leaves ADP and Joins Paycor

ADP began reviewing its profitability metrics in late 2019 and realized that Olson had four "no starts," ADP's term for a potential client which signs a sales contract but does not actually implement ADP's services. (*Id.* ¶¶ 27–29.) ADP asserts that because four "no starts" is a high number for a single associate, it initiated an investigation into Olson's sales. (*Id.* ¶ 29–30.) The investigation allegedly determined that Olson's four "no starts" were non-existent; in the meantime, says ADP, Olson had fraudulently received commissions on all four "sales." (*Id.* ¶¶ 30–34.) Olson resigned on December 16, 2019, allegedly to avoid answering ADP's questions about his purported fraudulent conduct. (*Id.* ¶ 35.) ADP alleges Olson earned approximately $170,000 on forged sales contracts. (*Id.* ¶ 36.)

After Olson left ADP, he took a position with Paycor, Inc., one of ADP's direct competitors, at Paycor's Fort Lauderdale location. (*Id.* ¶¶ 37–38; DE 1-1 Exh. H). While at Paycor, Olson has, by his own admission, worked on

accounts in the Southeast Florida region, including Boca Raton, Florida, which is located in Palm Beach County, and Coral Springs, Florida, which is located in Broward County. (Compl. ¶¶ 46–53; DE 1-1 Exh. H.) Olson's work in those locations is acknowledged in posts on his Linkedin account celebrating his sales successes. At the same time, however, Olson was telling ADP's attorneys that he was continuing to comply with the RCA. (Compl. ¶¶ 40–43; DE 1-1 Exhs. E–G.)

ADP alleges that Olson's employment at Paycor violates the RCA, NDA, and SRA. It says that Paycor is in the same business as ADP and that Olson is performing the same or substantially similar job functions as those he performed on behalf of ADP in the same territory. (Compl. ¶¶ 48–49.) It also asserts that Olson either has used, or will use, ADP's proprietary information for the benefit of Paycor in violation of the agreements. (*Id.* ¶ 56.)

### D. ADP Brings This Suit

On March 26, 2020, ADP filed a complaint for injunctive relief, (DE 1), and moved for a preliminary injunction, (DE 3). It requests that the court enjoin Olson from: (1) working for any of its competitors in Broward, Miami-Dade, Monroe, and Palm Beach Counties for twelve months; (2) violating the terms of the RCA, NDA, and SRA; (3) using or disclosing ADP's confidential information at any time in the future; and (4) interfering with ADP's relationships with clients, prospective clients, and marketing partners. (DE 3-3 (proposed order).) It also requests that the court require Olson to return ADP's property and confidential information, and to refrain from destroying any documents in his possession which relate to the litigation. (*Id.*)

## II.   APPLICABLE STANDARDS

### A. Federal Preliminary Injunction Factors

The standards governing grant or denial of a preliminary injunction in this court are a matter of federal procedural law. "A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of

preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Because a preliminary injunction is "an extraordinary and drastic remedy," the plaintiff must establish each element by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, at 129–30 (2d ed. 1995)). Even then, a trial court's decision to issue a preliminary injunction is "an act of equitable discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

A Court will consider all four factors, but the first two are essential. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000); *accord Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (placing particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent." (quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982))); *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir. 1984); *Am. Express*, 669 F.3d at 366, 374.

## B. State Substantive Law

The substantive rule of decision in this diversity case is New Jersey state law. This Court's "role in diversity cases is to apply state law as announced by the state's highest court." *LaBarre v. Bristol-Myers Squibb Co.*, 544 F. App'x 120, 125 (3d Cir. 2013) (citing *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 253 (3d Cir. 2010) ("A federal court under *Erie* [*R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817 (1938)] is bound to follow state law as announced by the highest state court." (internal citations omitted))). "In the absence of a controlling decision by the [state] Supreme Court, we must predict how it would decide the questions of law presented in this case." *Wolfe v. Allstate*

*Prop., & Cas. Ins. Co.*, 790 F.3d 487, 492 (3d Cir. 2015) (citing *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45-46 (3d Cir. 2009)); *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 244 (3d Cir. 2010); *New Castle County DE v. National Union Fire Ins. Co. of Pittsburgh, PA*, 243 F.3d 744, 749 (3d Cir. 2001). A federal district court in that position should consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Berrier*, 563 F.3d at 46 (quotation and citation omitted).

"In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." *Downs v. U.S. Pipe & Foundry Co.*, 441 F. Supp. 2d 661, 663 (D.N.J. 2006) (quoting *Gares v. Willingboro Twp.*, 90 F.3d 720, 725 (3d Cir. 1996)). Rulings by New Jersey's Appellate Division, then, "must be accorded significant weight and should not be disregarded absent persuasive indication that the highest court would rule otherwise." *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir. 1996).

Many decisions, both state and federal, have interpreted the very ADP agreements at issue here. *See* Section III.A.1, *infra*. All have analyzed them in light of the so-called *Solari* factors: whether the restriction

[1] is reasonably necessary to protect [an employer's] legitimate interests,

[2] will cause no undue hardship on the defendant, and

[3] will not impair the public interest.

*Solari Industries, Inc. v. Malady*, 55 N.J. 571, 576 (1970).

## III.    APPLICATION OF PRELIMINARY INJUNCTION FACTORS

As discussed *supra*, a plaintiff seeking a preliminary injunction must show a likelihood of success on the merits, irreparable harm, that the balance of equities are in his or her favor, and that an injunction serves the public

interest. *Winter*, 555 U.S. at 20. All four preliminary injunction factors weigh in favor of ADP here.

### 1. Likelihood of Success on the Merits

On a motion for a preliminary injunction, ADP must demonstrate its likelihood of success on the merits. *See SK & F. Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980). That is, ADP need only establish "a reasonable probability, not the certainty, of success on the merits." *Id.* In this case, which is governed by the test set forth in *Solari*, the merits depend upon whether the NDA, SRA, and RCA serve a legitimate business interest, will cause undue hardship on Olson, or will impair the public interest. 55 N.J. at 576.[2]

### a. The RCA Serves a Legitimate Business Interest

The ADP RCA agreement does not come to this Court as a matter of first impression. Rather, it has been extensively litigated in New Jersey federal courts, twice before me. *ADP, LLC v. Pittman*, 2019 WL 5304148 (D.N.J. Oct. 18, 2019); *ADP, LLC v. Trueira*, 2019 WL 5304435 (D.N.J. Oct. 18, 2019). Thus, the basic contours of a preliminary injunction to enforce such agreements are well defined.

In particular, it is now settled in the Third Circuit that ADP's RCA agreement serves a legitimate business interest under New Jersey law because it serves ADP's legitimate interest of protecting its client relationships against former employees. *ADP, LLC v. Rafferty*, 923 F.3d 113, 123 (2019). In *Rafferty*, the Third Circuit reversed a series of district court decisions which had concluded that the ADP agreements unfairly constrained competition. *Id.* at 123–24.[3] The RCA was particularly controversial. The panel concluded, however, that all of the agreements, including the RCA, served ADP's legitimate

---

[2] Olson does not contest the applicability of the NDA and SRA. Since I conclude the RCA applies in this case and is more burdensome than the NDA and SRA, I will focus my analysis on the extent to which the RCA applies.

[3] My own earlier decision in *Trueira, supra,* pending on appeal at the time, was remanded in light of *Rafferty*.

interests of protecting its client relationships against former employees. *Id.* at 123. It acknowledged that New Jersey courts find the "preservation of client relationships and the goodwill they generate are among the business interests . . . [which are] legitimate and worthy of protection," especially for ADP, whose "viability depends on its ability to attract—and retain—its clients." *Id.* The panel then reasoned that ADP was at greater risk of losing clients to high performing sales associates, who necessarily have more extensive client contact by virtue of their success. *Id.* It therefore concluded that more extensive supplementary restrictions on competition and solicitation via the RCA were permissible. *Id.*

The panel recognized that the agreements would, however, impose significant restrictions on former employees, and that those former employees may have "countervailing interests" which would require adjusting the scope of the RCA. *Id.* at 125. It concluded that in such instances, courts should engage in the process of "blue penciling," in which they essentially re-draft the terms of the agreements to preserve what portion of them are not unduly burdensome in violation of New Jersey law. *Id.* The panel declined to engage in a blue penciling process itself, however, electing instead to remand the case to the district court. *Id.*

Thus, the rough outlines of the analysis are these: the RCA agreement serves a legitimate business interest, but works a hardship on Olson. To determine the extent to which the RCA may permissibly restrain Olson's employment, then, I must blue pencil the agreement in accordance with New Jersey law.

### b. Undue Hardship

Even where a covenant serves legitimate business interests, "'it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity,' so that those interests are not outweighed by the hardship the covenant inflicts on the employee." *ADP, LLC v. Trueira*, 2019 WL 5304435 at *21 (D.N.J. Oct. 18, 2019) (quoting *Coskey's*

*Television & Radio Sales and Service, Inc. v. Foti*, 253 N.J. Super. 626, 635 (App. Div. 1992)). The Court must "balance the employer's need for protection and hardship on the employee that may result." *Ingersoll-Rand Co. v. Civatta*, 110 N.J. 609, 635 (N.J. 1988).

Shortly after *Rafferty* was decided, the New Jersey Appellate Division in *ADP, LLC v. Kusins* was faced with the ADP agreements and, agreeing with *Rafferty*, "blue penciled" the agreements to comply with New Jersey law. *ADP, LLC v. Kusins*, 460 N.J. Super. 368 (App. Div. 2019), *cert denied*, 240 N.J. 419 (N.J. 2020). The *Kusins* court reasoned that, since ADP's legitimate interest was in protection of its client relationships, the agreements were only enforceable to the extent that they served that interest. *Id.* at 405. It concluded that the restraints imposed by the RCA on former ADP employees' solicitation and competition were broader than necessary to protect such client relationships and so, in light of the burden they imposed on former employees, needed to be blue penciled. *Id.* In particular, the court revised the RCA's non-solicitation clause so as to prohibit

(1) direct or indirect solicitation of ADP's actual clients which defendants had substantial dealings with, or knowledge of, while at ADP; and

(2) direct or indirect solicitation of ADP's prospective clients that a former employee gained knowledge of during his or her employment at ADP.

*Id.* at 405–07; *Pittman*, 2019 WL 5304148 at *14. As regards the non-competition agreement, the *Kusins* court concluded that it permissibly applied only to

(1) competition with ADP within the geographical limits of the non-compete clause, not confined to any market segment, so long as the limitation is confined to the employee's prior territory.

*Kusins*, 460 N.J. Super. at 406–07; *Pittman*, 2019 WL 5304148 at *14.

*Kusins*, as a published decision by New Jersey's intermediate appellate court, is particularly persuasive, especially in light of the fact that the New

Jersey Supreme Court has since denied certification. *U.S. Underwriters Ins. Co.*, 80 F.3d at 93; *see* 240 N.J. 419 (N.J. 2020). As I did in *Pitman,* I here adopt *Kusins*'s blue penciling of the RCA agreement.

Given this backdrop, little remains open for dispute. Indeed, Olson acknowledges the proper scope of the RCA is largely a foregone conclusion; he requests only that the court limit the non-solicitation clause in accordance with *Kusins*. I will do so.

One dispute remains, however, concerning Olson's "territory" while working at ADP. Olson requests that the court blue pencil the non-compete clause to limit its geographic scope. Specifically, he argues that ADP overstates his sales territory, and so he requests that the court limit the RCA's reach to only those areas in which he "actually operated on behalf of ADP."

Olson admits that ADP assigned him specifically to a territory consisting of Palm Beach, Broward, Miami-Dade, and Monroe Counties (the "Southeastern Florida Counties"). *See* p. 3, *supra*. He asserts, however, that as it turned out, the "overwhelming majority" of his activities occurred in the southern half of Broward County. Opp. at 4–5. As a consequence, he argues, an injunction prohibiting him from competing with ADP in all four of the Southeastern Florida Counties would be unreasonably broad; instead, he argues, it should be limited to Palm Beach and South Broward County. *Id.*

I disagree. The RCA defines Olson's territory as any area where he "worked, represented ADP, or had Material Business Contact with ADP's clients in the two (2) year period preceding the termination of my employment with ADP." (DE 1-1 Exh. C ¶ 4.) Thus, if I find that Olson "worked" on behalf of or "represented" ADP in a particular region two years before Olson resigned on December 16, 2019, then that region must be regarded as a part of Olson's territory. *Serico v. Rothberg*, 234 N.J. 168, 178 (N.J. 2018) ("If the contract into which the parties have entered is clear, then it must be enforced as written.") (quoting *In re County of Atlantic*, 230 N.J. 237, 254–55 (2017)); (Compl. ¶ 35).

Olson admits in his opposition that beginning in July of 2017 and continuing at least into some point in 2018,[4] he held the position of "Broker District Manager – Healthcare" for ADP, and that he was assigned to the Southeastern Florida Counties, where he was "permitted to develop leads" on behalf of ADP. (Opp. at 3.) He admits that in his role as a Broker District Manager, he was tasked with developing relationships with individuals in the Southeastern Florida Counties and with selling ADP products and services to them. (Opp. at 3.) He further admits that he carried out his duties by selling ADP products within those Counties. (*Id.*) Those admitted facts plainly satisfy the common sense meaning of the terms "working" and acting as ADP's "representative." (Opp. at 4 (admitting to working on ADP's behalf in that region, primarily in Broward County)); *see also Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 223 (D.N.J. 2008) ("Under the basic rules of contract construction, a document must be read as a whole 'in accord with justice and common sense.'") (quoting *Krosnowski v. Krosnowski & Garford Trucking*, 126 A.2d 182, 188 (N.J. 1956)). Since Olson's role as Broker District Manager extended into 2018, it was within two years of his termination, so his territory in that role counts toward the definition of his "territory" for the purposes of the RCA.

Olson's effort to limit the definition of "territory" to solely those parts of the Southeastern Florida Counties where he "actually operated" (or conduced the "overwhelming majority" of his activities) is inconsistent with both the contractual text and applicable case law. In *Pittman*, I considered a former employee's argument that the RCA swept over too broad a geographic region. 2019 WL 5304148 at *16. There, the geographic restriction in question applied to the states of Oregon and Washington, which overlapped with the area

---

[4] The parties dispute whether Olson's positions as a "hunter" and "Client Services representative" constituted a "reassign[ment]" away from his role as a Broker District Manager, (Opp. at 3) or were an "addition" to that role, (Pl's Br. at 4; Compl. ¶ 14). I need not resolve this dispute, because in either case Olson was assigned to the Southeastern Florida Counties Region two years prior to his termination.

encompassed by the employee's new position. *Id.* Pittman argued that ZIP codes, rather than entire states, were the appropriate market divisions, noting that she had spent all of her time, not in Washington and Oregon generally, but in those states' largest cities. *Id.* at 17. Thus, rather than being prohibited from working in all of Oregon or Washington, Pittman sought to be excluded only from the cities where her former customers were located. *Id.*

I rejected that argument, concluding that the evidence suggested that Pittman was assigned to those states in general, regardless of the individual locations within the state where she had actually worked. *Id.* Thus, it was where the employee was assigned, rather than the precise locations where an employee worked, that delineated the permissible geographic scope of an agreement. *Id.* Since a geographical limitation may fairly apply to the employee's former territory, I concluded the restrictions prohibiting her from working in Oregon and Washington were permissible. *Id.*[5]

Similarly, here Olson admits he was assigned to serve as ADP's representative in the Southeastern Florida Counties, so that is his territory. Under *Pittman*, it is not relevant that he may have only worked in certain ZIP codes within that territory, or only in certain cities, or, as he claims, only in half of Broward County. Furthermore, the contract delineates his territory not only according to where he "worked," which could conceivably be limited to where he "actually operated," but also to the region where he served as ADP's "representative," which by its plain language encompasses all of the areas where he was assigned to represent ADP's interests. Olson was assigned to the Southeastern Florida Counties, so that is his territory.[6]

_____

[5] Such a definition also fits better with the ordinary meaning of territory, a term which implies a contiguous area of land, not a collection of disparate locations.

[6] I also note that Olson tellingly never denies working in each county within the four County region. Instead, he asserts that he worked "almost exclusively" in south Broward County and Palm Beach County. (Opp. at 3.) Regardless, even if the scope of Olson's territory were actually disputed, I would find ADP more credible on the subject given the evidence ADP has brought forward demonstrating that Olson has frequently

I further reject Olson's assertion that such a limitation would be "overly harsh" and "punitive," or would "preclude[ him] from plying his now 20-year trade." (Opp. at 5.) This type of geographic restriction was already upheld in *Kusins*, and is less onerous than was approved in *Pittman*, where I precluded Pittman from working in two entire states. Olson can work for Paycor, or another company, in a variety of other roles, or in other regions of Florida. He must simply refrain from working in the Southeastern Florida Counties in the same capacity that he served ADP. The area from which he is excluded is actually fairly small, as these things go. What ADP is asking is reasonable, and I will grant it.

The language of the RCAs, as blue penciled above, are reasonable and enforceable against Olson.

### c. Public interest

The final *Solari* factor instructs courts to consider the fact that "enforcement of the restriction should not cause harm to the public." *Cmty. Hosp.*, 183 N.J. at 60 (citing *Karlin*, 77 N.J. at 424). Like the ADP cases reviewed in *Rafferty*, this case contains "no major public component." 923 F.3d at 127. The imposition of restrictive covenants here creates no injury, for example, to "the rights of the public to have free access to the advice of professionals licensed by the State," as it may do in the context of physicians and accountants. *Coskey's*, 253 N.J. Super. at 634. Like the court in *Rafferty,* I find the public interests here to be generic and diffuse.

I therefore find that ADP has a likelihood of success in its attempt to enforce the RCA, as blue-penciled by the Court here. Olson appears to be violating the RCA into which he entered with ADP. He has taken a position with one of ADP's direct competitors, a position in which he sells competing products in his former territory. ADP has demanded his compliance with the obligations and has, moreover, identified case law that recognizes its legitimate

---

lied about the scope of his sales territory at Paycor. (Compl. ¶¶ 45–56; DE 1-1 Exhs. E–G.)

business interest in enforcing the agreement. Nonetheless, Olson has remained in his position at Paycor and refuses to conform his behavior to accord with the agreement. His counsel has responded on his behalf, admitting the extent of Olson's territory when working for ADP, territory in which he is currently working for Paycor in violation of the non-compete. Despite the restricted scope of the RCA, it nonetheless appears that ADP has shown its likelihood of success on the merits.

### 2. Irreparable Harm

Harm is considered "irreparable" if it is not redressable by money damages later, in the ordinary course of litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1964)). ADP has the burden of proving a "clear showing of immediate irreparable harm" absent injunctive relief. *ECRI v. McGraw-Hill Inc.*, 809 F.2d 223, 225 (3d Cir. 1987); *see also Winter*, 555 U.S. at 21 (holding it was error to water down the irreparable harm requirement from "likelihood" to "possibility." even where likelihood of success was strong).

ADP argues that the irreparable harm it will suffer is the loss of existing and prospective clients, employees, marketing partners, confidential and proprietary information, trade secrets, and customer goodwill. Courts in the Third Circuit and this District have had no difficulty in finding that the loss of business opportunities and goodwill constitutes irreparable harm. Likewise. New Jersey courts recognize that "the diversion of a company's customers may. . . constitute irreparable harm . . . . [T]his is so because the extent of the injury to the business as a result of this type of conduct cannot be readily ascertained, and as such, does not lend itself to a straightforward calculation of money damages." *Fluorarnics, Inc. v. Trueba*, No. 408-05, 2005 WL 3455185 at *8 (N.J. Super. Ct. Ch. Div. Dec. 16, 2005) (citation omitted). Improper use of trade secrets constitutes irreparable harm. *See U.S. Food Serv., Inc. v. Raad*, 2006 WL 1029653 at *6 (N.J. Super. Ch. Div. Apr. 12, 2006) at *7 ("Damages will not be an adequate remedy when the competitor has obtained the secrets.

The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss.").

At a minimum, there is overlap between ADP and Paycor's lines of business. Paycor is a direct competitor of ADP, and Olson is responsible for selling the same type of products at Paycor that he was at ADP and is working in his former ADP territory. Together these facts indicate that ADP has made a clear showing that Olson's behavior establishes a strong likelihood of irreparable harm to ADP that is independent of competitive harm. Such harm consists of potential misuse of confidential information and trade secrets, loss of business opportunities, and impairment of business goodwill.

ADP has demonstrated that its injuries cannot be redressed post hoc by money damages. This prong therefore favors a preliminary injunction to prevent irreparable harm.

### 3. Balancing the Equities and the Public Interest

The final two prongs, balancing of the harms and the interest of the public, require little additional discussion.[7] They weigh in favor of granting injunctive relief.

No doubt enforcement of the RCA will cause Olson some hardship. But that alleged hardship—requiring him to adhere to the RCA to which he agreed, as limited by subsequent case law—is neither precisely established nor unduly burdensome. For a year, he may not compete with ADP in Southeastern Florida. He may not solicit ADP's actual or prospective clients with which he had substantial dealings, or of which he gained knowledge, while at ADP. He may otherwise continue to do everything short of that (provided that his conduct does not otherwise violate the RCA). After a year has passed, Olson can return to working for Paycor in the fullest capacity. The opportunities open to Olson remain substantial.

The public interest, for the reasons stated above, is a neutral factor.

---

[7]   The *Solari* analysis has to some extent already considered such factors.  *See* Section III.A.1, supra.

Balancing the four relevant factors, I find that a preliminary injunction is well justified. Accordingly, Olson is for a period of twelve months enjoined from: (1) directly or indirectly soliciting ADP's actual clients with whom he dealt substantially while at ADP or of whose identity he learned during his employment at ADP; (2) directly or indirectly soliciting ADP's prospective clients of whose identity he learned during his employment at ADP; competing with ADP in any of the Southeastern Florida Counties. In line with the RCA, the non-competition, non-solicitation, and non-interference provisions shall be enforced for twelve months following the issuance of this order.

## IV.   CONCLUSION

For the foregoing reasons, ADP's motion for a preliminary injunction is **GRANTED**. Pursuant to the terms of the RCA, Olson shall be restrained, for a period of twelve months after the date of entry of this preliminary injunction, from violating the agreements as discussed above.

An appropriate Order granting ADP's motion and requiring the parties to submit an agreed form of preliminary injunction follows.

Dated: October 28, 2020

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**